RYAN–RICHARDS, Inc., v. WHITESIDES et al.

No. 1627.

Circuit Court of Appeals, Tenth Circuit.

May 6, 1938.

James S. Twyford, of Oklahoma City, Okl. (Solon W. Smith and William J. Crowe, both of Oklahoma City, Okl., on the brief), for appellant.

T. Murray Robinson, of Oklahoma City, Okl. (Leverett Edwards, of Oklahoma City, Okl., and T. M. Robinson, of Altus, Okl., on the brief), for appellee Artie Whitesides.

Before LEWIS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

Artie Whitesides as plaintiff instituted this action for herself as widow and as next friend of Edward Richard Whitesides, her minor son by her husband, Major E. Whitesides, deceased, against Ryan-Richards, Incorporated, to recover damages for the alleged negligent killing of her said husband, about 11:30 a. m. on December 21, 1933, at a point on highway 62 about one and one-half miles directly east of Altus, Okl.

By amended petition Percy Meacham became a party defendant.

The parties will be referred to herein in the order in which they appeared in the lower court, and when not so designated will be referred to as follows: The plaintiff as "widow" and the defendants, Ryan-Richards, Incorporated, as "contractor," and Percy T. Meacham, as "truck driver."

The said "contractor" answered, denying each and every allegation except where admitted, and interposed the plea of contributory negligence on the part of said decedent and averred that the injury, if it occurred as alleged, which was by defendants denied, that the party occasioning same was not an agent, servant or employee of said "contractor," but an independent contractor operating his own truck, under no control or supervision of said "contractor," who was in no wise responsible for said negligence and consequent damage.

Plaintiff (the widow) by reply denied all affirmative averments contained in said answer, specifically pleading as to the allegation that the said "truck driver" was an independent contractor, that the "contractor" was then and there operating under a

contract with the Highway Commission of the State of Oklahoma, pursuant to section 204 of the National Industrial Recovery Act, 40 U.S.C.A. § 404, which provided:

"For the purpose of providing for emergency construction of public highways and related projects, the President is authorized to make grants to the highway departments of the several States in an amount not less than $400,000,000 to be expended by such departments in accordance with the provisions of the Federal Highway Act, approved November 9, 1921, as amended and supplemented [chapter 1 of Title 23], except as provided in this title [chapter] as follows: * * *

"(c) All contracts involving the expenditure of such grants shall contain provisions establishing minimum rates of wages, to be predetermined by the State highway department, which contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals for bids for the work."

And further averred that certain funds were allotted under the provisions of said act to the State Highway Commission, on account of which the State Highway Commission entered into a contract for certain road improvements on the highways of the State of Oklahoma, containing the following provision:

"No portion of the contract shall be sublet, assigned or otherwise disposed of except with the written consent of the contracting officer or his authorized representative. Requests for permission to sublet, assign or otherwise dispose of any portion of the contract shall be in writing and accompanied by showing that the organization which will perform the work is particularly experienced and equipped for such work. The contractor shall give assurance that the minimum wage for unskilled labor and the maximum amount to be deducted for board, if furnished, as stated in his proposal shall apply to labor performed on all work sublet, assigned or otherwise disposed of in any way. Written consent to sublet, assign or otherwise dispose of any portion of the contract shall not be construed to relieve the contractor of any responsibility for the fulfillment of the contract."

A certified copy of said contract was attached as a part of said reply, with the further allegation that neither was application made to the State Highway Commission nor its written consent obtained to sublet or assign or otherwise dispose of any portion of said contract, and that the said defendant, the "contractor," was prohibited by its terms from employing the said "truck driver" as an independent contractor to perform any of the work thereunder, it being further alleged therein that: "Copies of all pay rolls for work performed under this contract (whether done by the contractor or under a sub-contract or otherwise), certified under oath by the contractor or his authorized representative, shall be filed with the engineer, showing the name of each employee, the State and the county of his bona fide residence, the agency from which his name was obtained, whether or not a veteran with dependents, the class of work performed, the hours worked each day, the wage rate paid, the total amount earned and deductions for board, if any"; and that in accordance with said contract, and for the purpose of receiving payments thereon, the said "contractor" made its sworn reports to said Highway Commission, stating that the said "truck driver," who is one and the same person as P. T. Meacham, was an employee of said "contractor," a certified copy of one of said reports so made being attached to said reply and made a part thereof.

Judgment on verdict was for plaintiff, from which this appeal followed.

The deceased, whilst driving a truck on the highway east of Altus, Okl., traveling westward on said highway, and having picked up two hitchhikers, one of whom was blind, but both of whom were in his truck, stopped said truck on the north shoulder of said gravelled and graded highway as far away from the traveled road as practicable. Having gotten out of said truck, he was standing on its south side making repairs on the motor when the said "truck driver" driving a gravel truck, also going west towards Altus, drove up directly behind the Whitesides truck until close to it, then swerved out, and around the said truck, the plainly defined tracks disclosing that the "truck driver's" truck missed the Whitesides truck about a foot and one-half, a line of blood and brains being along its tracks for some distance.

At the time of the accident the two hitchhikers were sitting on the bed of the truck just behind the cab, on the right side, facing north, one of whom, Wiley Giddens, being blind, could not tell how close the "truck driver's" truck came to the deceased's truck. The other, Reginald Rutledge,

testified that the Whitesides truck stopped where the accident occurred, pulling out to the right side of the road, he (witness) being on the flat bed facing north, talking to blind Wiley Giddens, whilst Whitesides was working on the motor with the hood up, the motor idling, witness, not hearing "truck driver's" truck but only a noise, looked around and saw Whitesides lying in the road about 35 feet in front of his truck, and the "truck driver's" truck stopped about 500 yards further down the road. The said Reginald Rutledge examined the truck tracks from the "truck driver's" truck back and along past the Whitesides truck, which were 18 or 20 inches from the Whitesides truck, Whitesides' hat lying under same, and thus tracing same from "truck driver's" truck location back past the Whitesides truck, the tracks being 18 inches outside from the Whitesides truck.

Ross Rutherford, the county attorney of said county, testified that on December 21, 1933, he went to the scene of the accident, it being an ordinary clear day—neither wind blowing nor sand flying, on said highway (No. 62), the traveled part of the highway being about 60 feet wide, its entire right of way covering 100 feet, the bar pit being not over a foot deep with gradual slope. The Whitesides truck headed west, the body of the deceased still in the road, he examined and made investigation to find where the truck driven by the "truck driver" had passed with reference to the Whitesides truck, and found that it had come from the east toward the west directly behind the Whitesides truck parked on the north side of the road as close to the bar pit as it could get without being driven into the bar pit, there being room on the left side of the road for two cars driving abreast to pass the Whitesides truck, the "truck driver's" tracks coming directly behind the Whitesides truck, and disclosing that he had traveled behind the Whitesides truck till he got close to it, then swerved out, the plainly defined tracks showing he missed it possibly a foot and one-half or two feet south of the Whitesides truck, and along its track there being a line of brains and blood.

O. R. Jones, undersheriff, going from Altus to the scene of the accident, did not see the "truck driver's" truck when he arrived, no other truck being there except the Whitesides truck. The place where he saw the sign of where the "truck driver's" truck had stopped was about one-fourth mile from the accident, there being only one set of tracks behind the Whitesides truck. He later saw the "truck driver's" truck at Altus. The auxillary gasoline tank on it extended out further than the wheels, 3 to 6 inches past the bed of the truck, with a clot of brains hanging on it. The road was straight where the accident occurred and a parked truck could have been seen practically as far as the vision of the eye could extend.

Ernest Hathaway, a deputy sheriff for seven years and such on December 21, 1933, went to the scene of the accident and made an investigation of tracks and observed a heavy set of tracks coming from the east on the north side of the road, and as these tracks came up, approaching the Whitesides truck, they swerved to the left or south of the Whitesides truck, missing it by 2 or 3 feet, and was able to follow these tracks substantially up to where the body lay, there being brains scattered along the road parallel to the tracks, and signs on the road where the body had slid, which lay approximately 60 feet in front of the Whitesides truck, not in the center of the road, the body being west of the truck which was facing west, the highway a wide one, and the Whitesides truck being parked very close to the bar pit. He was present when Meacham talked, who said he saw no one standing around the truck, but about the time he got ready to pass, a man kind of stepped out and he thought turned around and about the same time he heard the truck strike something, and mentioned it to the boy who was riding with him. He then stopped his truck and went back to the Whitesides truck when he saw what had happened.

Demurrer to plaintiff's evidence on the part of each defendant was interposed, overruled, and exceptions saved.

Evidence on part of defendant[1] and rebuttal by plaintiff was introduced.

---

[1] Percy Meacham, a defendant, testified that he had lived at Lone Wolf, Okl., since 1924, and was not acquainted with deceased; that he saw him at the time of the accident when he was hauling sand for J. F. MaWirter who lived at Lone Wolf and who owned the New International Truck that he was driving, and was hauling 4 yards of sand which he got 2 miles east and three-fourth miles north of Indiahoma, about 35 miles from where the accident took place and about 40 miles from where it was to be delivered, the road construction being east of Altus on highway 62; and that he first saw the truck of Whitesides about

At close of all the evidence each defendant separately moved the court to direct the jury to return a verdict in his or its favor, exceptions being saved.

(1) Whether plaintiff met the burden of proof with substantial evidence tending to show that the negligence alleged was the proximate cause of the injury and (2) that

300 yards ahead of him, at that time being fully loaded and running about 35 miles an hour going west, and saw Whitesides standing beside his truck with one foot on the running board talking to some one in the cab or looking in the cab, and thought he was a highway patrolman, and as he approached slowed his truck to about 25 miles per hour, pulling over past the center grade of the road on the south side, and that he was on the south side of the road, having pulled over at least 150 yards down the road, and when he was about 25 feet from the truck some one reached out of the Whitesides truck. He could see his arm as it came out of the cab in a playing manner as if to strike at Whitesides. Whitesides jerked back and his hat fell off, and he started running across the road in front of Meacham, laughing. He did not have time to sound horn or anything, but wheeled over, missing him with the front end of the truck, but his head hit the gas tank on the side of the truck, and after he passed the parked truck he ran about halfway to a little culvert in the road before stopping, about 150 yards down the road. He asked the boy on his truck if he had knocked the man down and, being informed he had, he jumped off the truck and got on the side of another truck going east and rode back; that Green Cannon was the driver of this truck and it could not have been over four minutes from the time of the accident until he (Meacham) got back to the scene. Whitesides' body was lying about 15 feet from his truck, his feet to the northwest and his head to the southeast; one-half of his body being on the south side of the road and one-half on the north. Witness remained at the scene about 15 minutes, no sheriff or county attorney being there during that time, and then he drove to the courthouse at Altus, waiting for the sheriff. The surface of the road was smooth, hard gravel and could not be dented by wheels. Witness went to work on the 20th of the month, having seen Mr. James, the superintendent for Ryan-Richards out on the job and asked him if he needed any more trucks and, upon being asked what kind of truck he had, he stated he had an International with a 4-yard bed, and Mr. James, the superintendent, told him to get the sand at Indiahoma; that he would give him $1.50 per yard for hauling sand, and that Mr. James never gave him any instruc-

tions about how to go, how long he was supposed to work, just telling him how much he was paying, where to get the sand and said he would show him where to dump it when he got back. Witness hauled three loads on the 20th and one load on the 21st when the accident occurred, a total of 12 yards, for which he was to receive $18. Mr. James or his bookkeeper stood good for him on a gas bill which was deducted from the amount of the check. The check was shown him, and he stated that was the check which James' paymaster or bookkeeper gave him when he went back there for settlement after the accident occurred, and he gave the check to a man he was working for there in Altus and stated that it was his own signature on the back and was also the signature of Mr. MaWirter also on the back, and also identified his gas bill that they had stood good for. The money for the bill was held out of the check so he didn't know whether he or Ryan-Richards had paid it. The check was admitted in evidence, being signed by Ryan-Richards, Incorporated, in favor of P. T. Meacham, in the sum of $14.10, which was marked "Sand Haul," dated 12–21–33. It was endorsed first by P. T. Meacham and then J. A. MaWirter.

On cross-examination witness stated it was a clear bright day and level road, and that when he came to the truck he slowed down to 25 miles an hour, the truck being parked on the north side with one wheel off of the road next to the gravel on the bar pit, with plenty of room to get by; that he was about 25 feet from Whitesides when he turned to run across the road, when somebody reached out and slapped him (Whitesides), who ducked his head and whirled around, starting to run and from the expression on his face he was laughing; that he measured the distance with his eye and saw the expression on his face and the hand go out of the cab and saw the hat on the ground when he ran out and yet did not know whether he had hit the man or not, although the blow was sufficient to dash Whitesides' brains out and throw the body 15 feet. The road had a 30-foot surface, there being room for a car to pass between the two trucks, and the body fell about 15 feet in front of Whitesides truck. The auxiliary gas tank struck Whitesides, there being a 16-gallon fuel tank on the side of the bed. He denied that he had made different statements about how the acci-

Meacham was an employee of Ryan-Richards, Incorporated, and not an independent contractor, it is uncontradicted that the deceased, Whitesides, had stopped his truck on the north shoulder of the highway as near the bar pit as reasonably possible and as distant from the section of the road over which the main part of the traffic passed as

dent happened. He did not own the truck himself. When he went to work there was no agreement as to his working for any specific length of time; he never asked the superintendent how long he could work, and how long the job was, or anything about that, and did not contract to keep him for any definite period. When Meacham dumped his last load, he saw two or three other haulers who told him the job was over. Meacham had not agreed to haul any specific number of loads or to deliver any certain amount of gravel. The contract was not in writing but in parol. The material he was hauling belonged to the man who owned the sand bed, he supposed. He did not buy the sand and resell to Ryan-Richards; he had been driving a truck about ten years. MaWirter did not come out and procure the job. The sand did not belong to MaWirter. Meacham asked that his gasoline bill be paid and he was given a check for the rest of the money, the check being made out to Meacham and dated December 21, 1933. It was a Ryan-Richards check. Asked how the Ryan-Richards Company happened to stand good for his gasoline bill, he stated he had worked for them before. He told them he was out of gas and asked if they would stand good for it and they said yes, and when he slowed down believing he saw a highway patrolman it was that he was not afraid of the speed he was driving but because he had on a load of 13,000 pounds. He was getting $6 a load or $1.50 per yard for hauling.

On redirect examination he testified that he endorsed the check to J. M. MaWirter, who paid him for his services. He got $3 per day. He could stop work at any time. MaWirter could have called him off the job whenever he wanted to. He was supposed to have a load of 2,750 pounds on the truck but actually had on about 13,000 pounds.

MaWirter did not go with witness to make the deal with James. All the trucks on the job dumped at different places. The foreman told him where to dump. There was a flagman frequently placed out by Ryan-Richards along the jobs and when the trucks would come up to where this flagman was he would signal them and the man would slow down.

Green Cannon testified that he lived close to Fort Cobb and was acquainted with Percy Meacham on December 21, 1933, seeing him at that time, and met him around the culvert on highway 62 about 5 miles east of Altus that day. Meacham got on his truck and told him that he had run over a man and killed him. It was about 200 yards from Meacham to Whitesides' truck and about 400 yards from the culvert to Whitesides' truck. When they got to the scene of the accident, Whitesides was lying face downward about 20 or 30 feet in front of the truck a little to the left, that is, south, his body being a little north of the center of the road. There was blood on the road and on the truck fenders.

No blood was on the Whitesides truck. Meacham's truck was about 200 yards from the culvert and about 200 yards west of the Whitesides truck, and Meacham told him at that time that he had run over a man, when he took him back to the accident. Meacham also said he was working for Ryan-Richards, hauling sand—the same kind of work he was doing—and he got his job from James, who appeared to be in charge, and he supposed Ryan-Richards was paying him, and the foreman told him what to get and where to get it. Witness was driving his own truck and started to work on the 20th and hauled to the 21st. When he went back to the scene of the accident he could see tracks that looked to be tracks of the Meacham truck which he figured were about 3 or 4 feet south of the Whitesides truck. Some cars congregated at the scene before he left.

It was a big, wide, level road and a clear day. Witness did not work two whole days. He hauled after the accident while Meacham did not. Witness did not see the sheriff or undersheriff nor the blind man and his companion. Witness traced the tracks of the Meacham truck up to the Whitesides truck and then on east.

Ralph S. James testified that he was an engineer, was employed by Ryan-Richards, Incorporated, in December, 1933, as superintendent of a job in said county, east of Altus, Okl. He was superintending the construction project and culvert and employed the material haulers. He employed Meacham on December 20th and was to pay him $1.50 a yard for hauling sand. The agreement was made out on the road. He had some sand to be hauled from a pit just east of Indiahoma, and he had two or three men hauling. They were hauling

it could practically and safely be done, and had gotten out of the cab or driver's seat, going around on the south side of his truck, and raised the hood covering the engine on that side, endeavoring to make some repairs on its motor, and at the same time the defendant Percy Meacham, driving a gravel truck at a high rate of speed, at about 40

pretty fast and three or four other trucks came in on the job and stated they wanted a job and asked him what they were paying. He said he was paying $1.50 a yard for hauling sand and they all started hauling sand, and Meacham was one of these four. There was nothing said other than that he described the place where the sand was to be gotten and how much a yard was to be paid for it. Trucks were hired by the yard. They were neither maintained nor repaired by the employer, as the company did not want to be responsible for a man who had to go 40 miles for sand. He hired by the load. He saw the Meacham truck which had a gasoline tank located about the center of the body and a center dump gravel truck body, the tank being on the right side about 4 feet from the ground and about 16 to 18 inches in diameter, being located a couple of inches inside of the outside wheels.

The job was finished on the 21st. Witness kept the time and Mr. Faull made up the pay rolls, the wages being computed by the load. There was no agreement to carry any definite amount of loads. The contract was so much a load whether they got two or ten loads. When a hauler came in he drew a ticket and he either gave it to the foreman or the witness. Mr. Faull made up the pay roll, it being filed with the Highway Commission according to the contract. These truck drivers were being carried on these pay rolls but their wages were computed by the load. James, the superintendent, laid off the truck drivers or discharged them and told them when their time was up. During the period of hauling he had the right to start or stop any one from hauling when he wanted to. There was a main highway running through there which the haulers used in going to the sand pit. They were maintaining safety regulations such as barricades at the street corners and at holes. Witness did not tell the people how to get to the sand pit, all he had was a description of the distance east of Indiahoma and how far north. Witness gave the information to Faull from which to make up the pay roll. Witness also furnished Faull the information with which to pay the men and the names of those who worked.

C. S. Faull testified that he was employed in December, 1933, by Ryan-Richards, Incorporated, as cashier and on December 21st was located in Altus, where he took care of the checks and made up the records, and identified the original pay roll records on the job.

On cross-examination he stated that the record was that Meacham and Cannon worked on the 19th and 20th but that was a mistake, as it should read the 20th and 21st, and, further, that under the contract with the State employees were required to receive a minimum wage of 40 cents per hour. Witness identified an exhibit as the regular pay roll ending December 31, 1933, and found the name of P. T. Meacham on the pay roll record, showing he was paid $14.10 and there was a deduction of $3.90 for something they had to advance him. The $18 was paid for hauling 12 cubic yards of sand at $1.50 per yard. Witness identified some figures on the sheet being 2 and 4, which denoted the hours he used in hauling the sand, the figures being put there because they had to furnish the Highway Commission with a transcript of the pay roll showing he paid the employees, the men who worked on the job at least a minimum wage per hour for the hours spent on the job. He also identified the report to the Highway Commission and located the name of P. T. Meacham which showed that Meacham worked six hours and received $2.40. Asked if he knew whether Meacham was paid that sum or not, the witness stated that was included in the check he received for the hauling and there was no separate check for it. Asked why that item was reported to the Highway Commission in that way witness stated it was one of their regulations and that the purpose was to show to them that any one working on that job received the required pay for the hours put in; that they were paying this minimum wage, and that was included in the check they were getting for loads. They were not getting separate checks, but were lumped together. When he made the statement under oath that these people were employees and were being paid 40 cents per hour minimum wage he made it from the records of the company he had at that time and right after the information had been furnished him, and when he made the statement that Meacham was being paid 40 cents per hour minimum wage that was true according to his record. The information was furnished him about the number of hours given on the report that

miles an hour, neither sounding his horn nor giving any signal or warning of his approach to the point on the highway where, for over 300 yards away from the Whitesides truck, he admitted seeing it, and failed to slow same down as he approached. By keeping a proper lookout he could have seen it as far as the vision of the eye could carry. His statement is that as he approached it he slowed his truck down to 25 miles per hour, which is at variance with the weight of evidence in the record. He drove so close to the north shoulder of said highway in such a manner as to endanger vehicles and persons compelled to stop at such point on said highway, failing to keep his truck under reasonable control to avoid hitting the deceased, although in plain sight for several hundred yards before reaching that point.

Defendant Meacham admitted that he was overloaded, having 13,000 pounds on his truck, 2,750 pounds being the reasonably permitted load, the reserve gas tank on his truck projecting 3 to 6 inches beyond its right side, which struck deceased with sufficient force to crush his skull and scatter his brains along the roadway and hurl his body a long distance, 60 feet down the roadway, and not stopping his truck until he had gone about 400 yards beyond the point of the accident.

The court in submitting the issue as to negligence and proximate cause to the jury, committed no error.[2]

Whether Ryan-Richards, Incorporated, was an employer, and Meacham an employee, in Standard Oil Co. v. Parkinson, 8 Cir., 152 F. 681, 682, it is said:

"The test of one's liability for the act or omission of his alleged servant is his right and power to direct and control his imputed agent in the performance of the causal act or omission at the very instant of the act or neglect. There can be no recovery of a person for the act or omission of his alleged servant under the maxim, 'respondeat superior,' in the absence of the right and power in the former to command or direct the latter in the performance of the act or omis-

---

the men worked so he could make up the pay rolls, and that no trucks were hired upon which the driver could not make as much as the minimum wage, and the $18 was for the use of the truck as well as of labor in hauling the same.

R. R. Ryan, president of Ryan-Richards, Incorporated, in 1933, testified at that time the company was engaged in highway construction in said county; that he did not see the accident involved herein, but was acquainted with the terms of the employment contract made between James and Meacham. The contract called for the payment of $1.50 per yard for each yard of sand delivered on the job, and thought at that time it was Meacham's truck. Witness identified labor and truck pay roll, which showed that on December 20th, Meacham hauled 12 yards of sand at $1.50 per yard and was paid $14.10, the balance of $3.90 being deducted, and that the report to the Highway Commission is to show that the truck drivers were receiving the minimum wage on the job; that he was familiar with the feature of his contract prohibiting the subcontract of any of the job excepting he can sublet to persons only with the permission of the State Highway Department, and he did not have the permission of the Highway Department to subcontract this hauling. Asked whether or not he considered this a separate contract that would require him to get permission from the Highway Department, he answered that under the contract he could haul sand in by truck or railroad anyway he wanted to and did not consider it necessary to get the direct consent of anybody to have sand hauled in at so much per cubic yard. No objection to such hauling was made by the Highway Commission, and he carried these men on the pay roll report to the Highway Commission to show that they received the minimum wage regardless of who they were working for or what they did.

In plaintiff's rebuttal, Reginald Rutledge stated that after the accident Meacham made a statement in the presence of witness, saying he could not help the accident and that some one was in front of the truck boxing with Whitesides and knocked him out in front of his truck and he hit him, and Meacham later made another statement that Whitesides was standing at the cab of his truck and some one reached out and pulled his hat over his eyes and in backing up he was hit, and Rutledge further testified that there was no one else at the scene of the accident except witness, his uncle, Wiley Giddens (the blind man), and Whitesides, and none of these parties did any boxing or wrestling, and did not attempt to strike Whitesides or any one else.

[2] Walls v. Ellington, 6 Cir., 31 F.2d 285; Williams v. Hershfield Agency, 176 A. 574, 13 N.J.Misc. 134; Simoneau v. General Ice Cream Corporation, 85 N.H. 57, 154 A. 634.

sion charged, because in such a case there is no superior to respond. * * *

"The fact that Perry's compensation was agreed to be paid and was paid in solido for all that he did, including his hauling of the oil and gasoline and his sales, deliveries, collections, and remittances, indicates that all these acts were bound together and performed in the same relation, and the evidence that they were either by agreement or in fact so separated that he was an independent contractor in the performance of the former and the agent of the company in his relation to the latter is not so conclusive or convincing that all reasonable men in the exercise of an honest and unprejudiced judgment would agree that at the instant and in the act of driving upon the railroad Perry was his own master or without the command and direction of the company, while in the care, sale, delivery, and collection of the price of the oil and gasoline he was its agent. It is indisputable that there was substantial and persuasive evidence that in the performance of the latter acts Perry was the agent of the company subject to its command and direction. The driving of the team was an act ordinarily within the scope and course of such an agency, and, in view of the fact that the hauling and driving were paid for together with the acts of care, sale, and delivery, the evidence in this case is not so conclusive that he was not the agent of the company and subject to its command in the hauling and in the driving upon the crossing that it was the duty of the court below to withdraw that issue from the jury and to so hold as a matter of law. * * *"

In Howard W. Luff Co. v. Capece, 6 Cir., 61 F.2d 635, it is said (page 636): "In making application of general principles to specific facts, many and varied circumstances are relied upon in reported cases, such as the power of discharge, the payment of wages as distinguished from other forms of compensation, the continuity of the employment, the engagement by the alleged employee in a distinct business or occupation, the professional skill required in doing the employer's work, and so on. Such circumstances, however, are not ultimate facts, but are only more or less useful in determining whose is the work and whose is the power of control. * * *" See, also, Singer Mfg. Co. v. Rahn, 132 U.S. 518, 10 S.Ct. 175, 33 L.Ed. 440; New Orleans, M. & C. Railroad Co. v. Hanning, 15 Wall. 649, 21 L.Ed. 220; Pittsburgh Valve Foundry &

Construction Co. v. Gallagher, 6 Cir., 32 F. 2d 436; P. F. Collier & Son Co. v. Hartfeil, 8 Cir., 72 F.2d 625; Western Express Co. v. Smeltzer, 6 Cir., 88 F.2d 94, 112 A.L.R. 74; and Philadelphia & R. Coal & Iron Co. v. Barrie, 8 Cir., 179 F. 50 at page 54 (concurring opinion by Circuit Judge Sanborn).

James, the superintendent, employed the "truck driver," directing him where to get loads of sand and where to dump same, with no understanding as to how many yards or loads of sand or to what extent were to be hauled or how long the hauling would continue or as to whether as long as it was necessary for sand to be hauled and delivered or dumped for the completion of said construction. The "truck driver" was subject to be discharged at any time without regard as to whether the work was satisfactory, his compensation to be paid in solido for all that he did, including the use of the truck and the hauling and dumping of the sand, the contractor furnishing the gasoline to be deducted out of said compensation.

The "truck driver" was not engaged in a distinct business or occupation, as he neither owned the truck, nor furnished the sand, being temporarily employed. No information was furnished the "contractor" as to who owned the truck or how long he could use it. The employment was not distinctive. The contract not being in writing, its intent must be gathered from the direct and circumstantial evidence. The "truck driver" did not buy or sell the sand —did not know where it was located except as he was directed by the agent of the "contractor," and was to dump it along the highway where the construction work was being done as directed by the agent of the "contractor."

MaWirter had no part in the procuring of the job. The sand did not belong to him. The check was made out to the "truck driver" and not to MaWirter. The "contractor's" agent furnished the "truck driver" with the gas and oil for the truck, the bill for same being reserved when the payment for the work was made. The "truck driver" could not only cease work at any time but could also be dispensed with at any time.

A flagman located by the "contractor" along the construction line when the trucks loaded with sand would come along to dump signalled them to slow down or to dump.

The right of the employer to exercise a limited control over the work, without thereby destroying the independent charac-

ter of the contract, is recognized by the courts. Rules seem to be well established that, where the control reserved does not apply to the mode or manner of having the work done, not in any way taking the work out of the hands of the contractor, it will not destroy the independent nature of the contract, the relation of master and servant not to be inferred from the reservation by the employer of powers which do not deprive the contractor of his right to use his own methods in carrying out his contract.

The mere fact that a proprietor retains a general supervision over work to be constructed for him by another, to satisfy himself that the contractor carries out the stipulations of his contract, does not make the proprietor responsible for the wrongs done to third persons in the prosecution of the work. If the other provisions of the contract are such as render the person employed an independent contractor, he will not be converted into a servant by the insertion of stipulations reserving to the employer "the right to change, inspect, and supervise to the extent necessary to produce the result intended by the contract." The mere fact of direction as to things to be done, without control over the methods or means of doing them, does not make a contractor a servant. The right of the defendant to supervise the work so far as to see whether it was done according to contract does not throw the responsibility if any, of the contractor, upon the employer.[3]

In the instant case the "contractor," in a written report made to the Highway Commission, sworn to, stated that the "truck driver" was its employee. This is direct evidence to be considered in connection with all the circumstances. True, the "contractor" and its codefendant, the "truck driver," seek to explain this admission in writing, but that, under the evidence in the record, is a question for the determination by the jury as to independent contractor vel non.

In Dishman v. Whitney, 121 Wash. 157, 209 P. 12, 29 A.L.R. 460, it is said (page 13): "One of the tests to determine the question is whether the employer retained the right, or had the right under the contract, to control the mode or manner in which the work was to be done. Where the facts presented are as consistent with the theory of agency as that of independent contractor, the burden is upon the one asserting the independency of the contractor to show the true relation of the parties. This may be a mixed question of law and fact, or of law alone."

In Norwegian Danish M. E. Church v. Home Tel. Co., 66 Wash. 511, 119 P. 834, it is said (page 835): "These facts are quite as consistent with the theory of agency as that of independent contractor, and the burden shifts to appellant to show its true relation to the construction company, the best evidence of which would have been its contract, thus making a mixed question of law and fact, or one of law alone."

The judgment of the lower court is affirmed.

[3] Missouri, K. & O. R. Co. v. Ferguson, 21 Okl. 266, 96 P. 755; Chicago, Rock Island & Pacific Railway Co. v. Bennett, 36 Okl. 358, 128 P. 705, 20 A. L.R. 678; Branham v. International Supply Co., 166 Okl. 273, 27 P.2d 354; Texas Pipe Line Co. v. Willis, 172 Okl. 148, 45 P.2d 138; Ellis & Lewis v. Warner, 180 Ark. 53, 20 S.W.2d 320; Hobbs-Western Co. v. Carmical, 192 Ark. 59, 91 S.W.2d 605; Dave Lehr, Inc., v. Brown, 127 Tex. 236, 91 S.W.2d 693; Tierney v. Correia, 120 Conn. 140, 180 A. 282; Chase v. American Press Brick Co., Mo.App., 31 S.W.2d 246; Coul v. Peck Dry Goods Co., 326 Mo. 870, 32 S. W.2d 758; Fox v. Pallotta, 274 Mass. 110, 174 N.E. 190; Long v. Eastern Paving Co., 295 Pa. 163, 145 A. 71; McDonald v. Hall-Neely Lumber Co., 165 Miss. 143, 147 So. 315; Berry v. Irwin, 220 Ky. 708, 295 S.W. 1020; Albert v. Hudson, 49 Ga.App. 636, 176 S.E. 659; Burns v. Eno, 213 Iowa 881, 240 N.W. 209; Antonelly v. Adam, 175 Minn. 438, 221 N.W. 716; Kruse v. Weigand, 204 Wis. 195, 235 N.W. 426; Potts v. Pardee, 220 N.Y. 431, 116 N.E. 78, 8 A.L.R. 785; Seeley v. Osborne, 220 N.Y. 416, 116 N.E. 97; Gall v. Detroit Journal Co., 191 Mich. 405, 158 N. W. 36, 19 A.L.R. 1164. Cf. 29 A.L.R. 470.