Fernando Sierra Berdecía, Secretary of Labor, Plaintiff and Appellant, *v.* Pedro A. Pizá, Inc., Defendant and Appellee.

No. 358. Decided November 6, 1962.

*Manuel Janer Mendía* and *Carlos Bastián Ramos* for appellant. *Leopoldo C. Delucca* for appellee.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, pro-tempore, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

■ Relying on the minimum wage legislation in force in Puerto Rico since 1941,[1] the Secretary of Labor filed a complaint against the corporation Pedro A. Pizá, Inc. for vacation pay. The action was originally brought for the benefit of seven automobile salesmen on commission, but subsequently four other beneficiaries were included. The claim covers the period from 1951 to 1959. There is no controversy as to the amount if we interpret the minimum wage decrees as covering the work performed by them. The only issue [2] is whether, on the basis of the evidence heard, the persons for whose benefit claim was made were defendant's employees, or, on the contrary, whether they were independent contractors, as held by the trial court.

It is therefore necessary to make a brief review of the applicable mandatory decrees. Mandatory Decree No. 8 was promulgated on April 5, 1945, fixing minimum wages, maximum working periods, and working conditions in the retail trade, which was defined as "every act, process, operation, work or service necessary, incidental or related to the retail sale or direct transfers to consumers *of any kind of merchandise or product* for money, promise, or thing of value, whenever such sales or transfers originate, are transacted, or carried out in any establishment or place, wholly or partially devoted to such purposes, or *whenever made*

---

[1] The two basic laws on the matter are No. 8 of April 5, 1941, 29 L.P.R.A. §§ 211–40, and No. 96 of June 26, 1956, 29 L.P.R.A. §§ 245–246m (Supp.).

[2] In *Secretary of Labor* v. *Hull Dobbs Co.*, 86 P.R.R. 421, we have held that the decree fixing wages and working conditions for the retail trade is applicable to the retail sale of automobiles.

*outside such establishment* or place in its name or for its benefit . . ." It recognized to every permanent employee the right to vacation at the rate of 15 days a year which could be accumulated for two years, such accumulated vacation to be paid upon the employee ceasing in his work (art. F-3). The first amendment of this decree was effective August 15, 1955. It contains a more concise definition of the industry which is substantially the same as the original, and expressly provides that the provisions on minimum wage, guarantee of minimum weekly compensation, and maximum working periods shall not apply to employees working as bona fide "traveling salesmen" (§ 3, 29 R.& R.P.R. § 245n-133.[3] With respect to vacation, it establishes the right thereto at the rate of 1-¼ working days for each month during which the employee has worked not less than 120 hours, and the same may be accumulated for not more than two years; however, if it exceeds such period, the employer shall also pay him twice the corresponding wages for the period in excess of the said two years (§ 8, 29 R.&R.P.R. § 245n-138). Mandatory Decree No. 42, which substitutes Decree No. 8 as respects minimum wage only, went into effect May 10, 1958, and to that end it reiterates that the definition of the industry "does not include either employees working as traveling salesmen" (§ 2, 29 R.& R.P.R. § 245n-642). However, everything relative to vacation contained in the original and revised Decree No. 8 remains in force by virtue of the express saving clause of § 40 (*b*) of the Minimum Wage Act of 1956, *supra*, 29 L.P.R.A. § 246k (1961 Supp.).[4]

---

[3] An identical exclusion appears in § 1 of Mandatory Decree No. 16 (29 R.&R.P.R. § 245n-271), and § 2 of Decree No. 34 (29 R.&R.P.R. § 245n-562), applicable to the wholesaling and warehousing industry, see *A. D. Miranda, Inc.* v. *Falcón*, 83 P.R.R. 708 (1961), and in § 3 of Decree No. 24 (29 R.&R.P.R. § 245n-443) of the beer industry.

[4] That section reads as follows:

". . . . . . .

"(*b*) The provisions contained in the mandatory decrees in force

The persons for whose benefit the complaint was filed rendered services to defendant enterprise in the sale of automobiles and received as compensation a sum equal to five per cent of the difference between the price of the unit and the appraised value of the customer's vehicle traded in. Exceptionally, and owing to the peculiar circumstances of the transaction—sales to government agencies and instrumentalities and to taxicab enterprises—an amount certain was credited to them. Similarly, on certain occasions the salesmen agreed to reduce the amount of their commission in order to secure the consumation of a transaction. This commission was liquidated and paid monthly by check and without the salesmen signing payrolls. Under established rules, and although no record was kept of the working hours, the salesmen reported every working day, between 8:00 and 8:30 a.m., to the offices of the enterprise where they were furnished with a list of potential customers on whom they were supposed to call during the day. In case of inability to attend, it was their duty to telephone the sales manager of defendant corporation or his secretary to account for their absence. Unless they were busy on important business, they had to report to the offices at 2:00 p.m. in order "to prove that they were busy on business." A daily report was submitted on the business done the previous day and the information transmitted was accumulated for future reference. These reports were originally set up in writing, "we entered them in a small book," but this practice was discontinued. The work of the salesmen consisted in calling on potential customers in the metropolitan area, since in the rest of the Island the corporation had agents or distributors, and arouse their interest to purchase units the local distribution of which was made by the agency Pedro A. Pizá, Inc. itself,

on the date this act is approved, *other than those relative to minimum wage,* shall subsist with full force and effect even if the Board shall subsequently, by decree or order to that effect, change the minimum wage rates."

emphasizing the advantages, benefits, and conveniences of the automobiles of the enterprise. However, the sales manager had the last word as to the terms and conditions of a transaction, to which end the salesmen brought to the shops of Pizá the used units to be appraised for the purpose of crediting the amount thereof to the price of the car. After this preliminary step was taken, the manager instructed the salesmen on the conditions of the sale and urged them to call again on the interested party for the purpose of closing the deal. The salesmen could offer only the vehicles distributed by Pizá, and if they were caught doing business to sell other makes they were immediately dismissed.

In addition to the usual and ordinary work described, the salesmen were under the duty to attend meetings with officers of the enterprise which were held frequently, at which they were instructed on sales techniques and advantages of the product which it was necessary to point out to the customer, and the work done was discussed in an effort to intensify the sales activity. The salesmen were expected to transact a minimum number of operations in order to maintain their relations with the enterprise, since if the quota was not filled they were replaced or certain facilities made available for sales promotion were suspended. When asked "if you had a good day and sold two or three units . . . and earned enough for the week, could you stay home or did you have to go to work?", he answered: "I had to." (Tr. Ev. 65.) The salesmen were also required to report some times on Saturday afternoon to the display room for the purpose of demonstrating the new cars to the interested parties, but they received no compensation for this activity.

The enterprise assigned to every salesman an automobile for demonstration purposes and also paid the gasoline expenses. It also paid the premiums on a public-liability policy covering those vehicles while they were being used for business purposes. They were also covered by another insur-

ance when the automobiles were used for personal purposes, but the identity of the person who paid the cost of this additional insurance was not satisfactorily established. The transcript does not contain any evidence on these points such as the payment of workmen's compensation dues, social security, and unemployment insurance.[5] No desk was assigned to them in the offices of the corporation, nor were they authorized to incur expense accounts for sales promotion. So far the factual elements which must be considered in deciding the issue.

The respondent court held, on the basis of the facts stated, that the relationship existing between the parties was not the employer-employee relationship contemplated in the decrees, and that salesmen on commission were independent contractors. To that end it considered the degree of control exercised by the enterprise over the latter's conduct, and particularly that "appellee did not manage, control, or intervene in the method employed by complainants to perform their functions or work," as well as the fact that appellee "had no control over complainants' working period." Such conclusion was error.

■■ Aside from the fact that, as we shall presently see, the conclusions to be drawn from the facts stated must be different from those made by the trial court, it is necessary to lay down first certain norms in determining the nature of the employer-employee relationship as distinguished from an independent contractor. Above all, it is well to anticipate that the traditional common-law concept on the main characteristics of an independent contractor should not be applied strictly in the construction of statutes regulating minimum wages and working conditions. That is why the cases cited in the opinion appealed from are not applicable because they rest essentially on the common-law distinction between

---

[5] See Annotations, *Salesman on commission as within unemployment compensation or social security acts*, 29 A.L.R.2d 751 (1953), and 138 A.L.R. 1413 (1942).

an independent contractor and an employee.[6]  Furthermore, none of them deal with the construction of a remedial statute such as the Minimum Wage Act and, consequently, of the decrees promulgated thereunder.[7]  We know that in consideration of the public policy underlying this social legislation—improvement of working conditions to achieve minimum standards of general welfare of the workers—when there is doubt as to whether a decree is applicable to a certain class of employees, a restrictive interpretation which would exclude them from the protection it affords should not prevail.  *Commissioner of Labor* v. *Llamas*, 73 P.R.R. 847 (1952).

■■  The primary factors which the courts have considered significant in determining whether an employee or an independent contractor is involved are, without attempting to enumerate them all, the following: (1) nature, extent, and degree of control by the principal; (2) the degree of initiative or judgment displayed by the salesman in his business; (3) the investment made by the salesman in equipment and facilities to be able to perform his work, and whether

---

[6] *Plomb Tool Co.* v. *Sanger*, 193 F.2d 260 (C.A. 9, 1951); *Ryan-Richards, Inc.* v. *Whitesides*, 96 F.2d 826 (C.C.A. 10, 1938); *Arkansas Power & Light Co.* v. *Richenback*, 119 S.W.2d 515 (Ark. 1938); *C. M. Farmer Stave & Heading Co.* v. *Whorton*, 102 S.W.2d 79 (Ark. 1937); *Humphries et al.* v. *Kendall*, 111 S.W.2d 492 (Ark. 1937) *Mississippi River Fuel Corporation* v. *Young*, 67 S.W.2d 581 (Ark. 1934); *Moaten* v. *Columbia Cotton Oil Co.*, 97 S.W.2d 629 (Ark. 1936); *Powell* v. *Virginia Construction Co.*, 13 S.W. 691 (Tenn. 1890); *Jones* v. *Standerfer*, 15 N.E.2d 924 (Ill. 1938); *Prest-O-Lite Co.* v. *Skeel*, 106 N.E. 365 (Ind. 1914); *Lee Moor Contracting Co.* v. *Blanton*, 65 P.2d 35 (Ariz. 1937); *Thompson* v. *Robinson-Roberts Co.*, 56 P.2d 599 (Cal. 1936); *Hollingsworth* v. *Robe Lumber Co.*, 45 P.2d 614 (Wash. 1935); *Evans* v. *State Industrial Commission*, 18 P.2d 885 (Okla. 1933); *Flickenger* v. *Industrial Accident Commission*, 184 Pac. 851 (Cal. 1919); *Henry Haertel Service, Inc.* v. *Industrial Commission*, 248 N.W. 430 (Wis. 1933); *Los Angeles Athletic Club* v. *United States*, 54 F. Supp. 702 (Cal. 1944); *Modern Motors* v. *Elkins*, 113 P.2d 969 (Okla. 1941), the only case cited involving an automobile salesman on commission, is distinguishable as to the facts and is far from favoring appellee's theory.

[7] We have had occasion to discuss the difference between independent contractor and employee for the purpose of fixing liability for damages—

an independent business organization is necessary for such purpose; and (4) opportunities of profit or loss in the sales operations. WHM 91:465-66. From the facts recited above it appears that the enterprise retains a wide degree of control over the salesmen's activities; that the latter have no discretion to transact business except with the approval of the sales manager and under the conditions prescribed by him; that the salesmen make no investment in equipment and facilities, which are supplied by appellee; that they have no independent business organization, since, among other things, their base or center of operations is the appellee's metropolitan office where they procure the list of business to be transacted during the day and report on their work; and, lastly, they do not risk any losses because their compensation is based on their own activity and the success of their efforts. It is not accurate to affirm that appellee did not intervene in the method employed by the salesmen in carrying out their transactions. In this connection, the evidence shows that they are instructed on sales technique at meetings especially called for that purpose, that the individual activity is supervised, and that they keep track of the results of their work. Nor is it correct to assert that the enterprise has no control over the salesmen's working hours. According to the uncontroverted evidence, they are required to report at certain hours to the office of the sales manager and to inform on the work entrusted to them, thus making available to appellee the necessary and adequate information in determining whether they have been working during the day. We should recall in this connection that, owing precisely to the nature of the work performed, the provisions of the working period and minimum wage decree do not apply to traveling salesmen.

---

Mariani v. Christy, 73 P.R.R. 729, 742-45 (1952) ; and in matters involving workmen's accident compensation—Atiles, Mgr. v. Industrial Commission, 68 P.R.R. 107 (1948) ; Atiles, Mgr. v. Industrial Commission, 63 P.R.R. 573 (1944) ; Montaner, Mgr. v. Industrial Commission, 59 P.R.R. 284 (1941) ; Romero v. Industrial Commission, 57 P.R.R. 343 (1940).

Considering all the facts as a whole, the inescapable conclusion is that the salesmen on commission were employees of the appellee and as such were entitled to enjoy the vacation period provided by the decrees in question.

The judgment rendered by the Superior Court, San Juan Part, on June 13, 1960 will be reversed, and the complaint is sustained ordering appellee to pay to the employees for whose benefit claim was made the amounts referred to in the stipulation of the parties dated February 17, 1960, plus a like sum by way of penalty.

Mr. Chief Justice Negrón Fernández did not participate herein.

